Ryan B. Hancey (9101)
Adam L. Grundvig (12106)
J. Adam Knorr (15183)
KESLER & RUST
68 S. Main St., Ste. 200
Salt Lake City, UT 84101
Telephone: (801) 532-8000
rhancey@keslerrust.com
agrundvig@keslerrust.com
aknorr@keslerrust.com
*Attorneys for plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH**

| | |
|---|---|
| THE ESTATE OF ELISE LAUREN THOMAS, by her personal representative Leslie Thomas; STEVE THOMAS, an individual; and LESLIE THOMAS, an individual;<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON COUNTY, a Utah governmental entity; IHC HEALTH SERVICES, INC., a Utah Nonprofit Corporation doing business as ST. GEORGE REGIONAL HOSPITAL; DAVID G. GRYGLA, an individual; RICHARD A. SORENSEN, an individual; BRENT SPENCER JOHNSON, an individual; LACIE ADAMS, an individual; and JOHN DOES 1-20;<br><br>Defendants. | **COMPLAINT**<br><br>**(JURY DEMAND)**<br><br>Civil No.<br><br>Judge |

Plaintiffs, for cause of action against defendants, hereby allege as follows:

**PARTIES**

1. Leslie Thomas ("Leslie") is an individual who resides in Washington County, State of Utah. She is the mother of Elise Lauren Thomas ("Elise") and the personal representative of the Estate of Elise Lauren Thomas (the "Estate"). The Estate is a plaintiff in this matter, by and through Leslie, and Leslie is also a plaintiff individually.

2. Steve Thomas ("Steve") is an individual who resides in Washington County, State of Utah. He is the father of Elise, the husband of Leslie, and is a plaintiff individually.

3. Defendant Washington County (the "County") is a county in the State of Utah organized and existing pursuant to Utah law. At all times relevant herein, the County was the owner, operator and/or administrator of the Purgatory Correctional Facility a/k/a the Washington County Jail (the "Jail") and the Washington County Sheriff's Office (the "Sheriff's Office").

4. Under Utah law, the sheriff of the Sheriff's Office is responsible for taking charge of and keeping the Jail and the prisoners committed to the Sheriff's custody. Upon information and belief, at all times relevant herein, the Sheriff possessed final policymaking authority for the County regarding the operation and administration of the Jail, including policies and practices governing inmate and detainee housing, segregation, restraints, visitation, and the treatment of detainees with serious mental disabilities.

5. Defendant IHC Health Services, Inc., doing business as St. George Regional Hospital (the "Hospital"), is a Utah nonprofit corporation.

6. Defendant Dr. David G. Grygla ("Dr. Grygla") is an individual who, upon information and belief, resides in Washington County.

7. Defendant Dr. Richard A. Sorensen ("Dr. Sorensen") is an individual who, upon information and belief, resides in Washington County.

8. Defendant Brent Spencer Johnson, RN ("Nurse Johnson") is an individual who, upon information and belief, resides in Washington County.

9. Defendant Lacie Adams ("Deputy Adams") is an individual who, upon information and belief, resides in Washington County. At all times relevant herein, Deputy Adams worked at the Jail.

10. Defendant John Does 1-20 are individuals or entities who may share in the liability for Elise's incarceration and/or death, but whose names and identities have not yet been ascertained by the plaintiffs. Plaintiffs pray the Court for leave to amend this complaint when the true names and identities of any such defendants are ascertained through discovery.

11. The County and Deputy Adams are each a "person" as contemplated by 42 U.S.C. § 1983.

12. The County and Deputy Adams's actions alleged herein were done under color of law as contemplated by 42 U.S.C. § 1983.

13. On information and belief, each defendant's conduct alleged herein was motivated by evil motive or intent and/or involved reckless or callous indifference to Elise's rights.

## JURISDICTION AND VENUE

14. This court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343 because plaintiffs assert claims arising under federal law.

15. This court has supplemental jurisdiction over plaintiffs' non-federal question claims under 28 U.S.C. § 1367 because those claims both relate to plaintiffs' federal claims and are part of the same case or controversy.

16. Venue is proper in this court under 28 U.S.C. § 1391 because all defendants reside in Utah, and plaintiffs' claims herein arise from acts occurring in Washington County, State of Utah.

## GENERAL ALLEGATIONS

### Elise's medical conditions and disabilities

17. Elise was born on November 10, 1988 and later diagnosed with a rare genetic condition called Kabuki syndrome.

18. Kabuki syndrome causes, among other things, physical manifestations (such as distinctive facial features and skeletal problems) and intellectual deficits (such as developmental delays and learning difficulties).

19. Consistent with people having Kabuki syndrome, Elise also suffered from other challenges, such as schizophrenia, bipolar disorder, autism, psychosis, hallucinations, suicidal ideation, homicidal ideation, major depressive disorder, borderline intellectual functioning, mental retardation, and intellectual disability.

20. Even as an adult, Elise was incapable of conversing like an adult.

21. Even as an adult, Elise had the intellectual abilities of a young grade school child.

22. Elise's disabled state was open and obvious to any person who interacted with her.

23. In 2024, Elise's disabled state was open and obvious to the persons at the Hospital who provided medical or nursing care to her.

24. In 2024, Elise's disabled state was open and obvious to the persons at the Jail who interacted with her.

25. In 2025, Elise's disabled state was open and obvious to the persons at the Hospital who provided medical or nursing care to her.

26. In 2025, Elise's disabled state was open and obvious to the persons at the Jail who interacted with her.

**Utah County Case 101403076 ("Case 3076")**

27. On October 6, 2010, the State of Utah charged Elise with Aggravated Assault with a Deadly Weapon or Force and Criminal Mischief in Provo District Court (case 101403076).

28. On December 15, 2010, the court in Case 3076 ordered a competency evaluation of Elise.

29. On February 2, 2011, the court determined Elise was not competent and dismissed the case.

**Washington County Case 231600352 ("Case 0352")**

30. On November 11, 2023, Washington City charged Elise with Assault in Washington City Justice Court (case 231600352).

31. On February 23, 2024, Washington City Prosecutor Lane Robert Wood moved to dismiss Case 0352 "based upon the interest of justice."

**Elise's December 2024 visit to the Hospital**

32. In December 2024, Elise resided in a group home operated by Forever Care.

33. On December 16, 2024, Forever Care staff took Elise to the Hospital because she was hearing voices and not sleeping.

34. At the emergency department of the Hospital, Forever Care staff informed Hospital staff that Elise was intellectually challenged, hearing voices, and hallucinating.

35. Hospital staff told Forever Care staff they would admit Elise into the emergency department until a bed was available in the behavioral medicine department.

36. On December 16 or 17, 2024, because Elise met criteria for inpatient psychiatric admission, the Hospital admitted Elise to the behavioral medicine floor for agitation and psychosis.

37. During the December 16 or 17, 2024 Hospital stay, Hospital staff noted:

a. Elise was experiencing increasing auditory hallucinations that persisted all day, every day.

b. These hallucinations were increasing in aggression and requesting that Elise hurt herself and others.

c. Elise could no longer manage her hallucinations.

38. Upon information and belief, on December 17, 2024, Hospital security officer Ron Issacson notified St. George Police Department Officer Lona Trombley that Elise had assaulted a Hospital worker named April Hall.

39. Hall told Officer Issacson that she wanted to “pursue charges” against Elise.

40. Officer Issacson noted in his report that Elise had Kabuki syndrome, suffered from auditory hallucinations, and “[t]he voices Elise hears frequently tell her to hit others.”

41. Officer Issacson issued Elise a citation for assault and took no further action.

42. Upon information and belief, on December 18, 2024, Hospital staff members Jessica Velazquezroldan and/or Nurse Johnson contacted law enforcement regarding Elise.

43. Police Department officers Saxton Brown and Jessica Marbery responded to the call and arrived at the Hospital.

44. Nurse Johnson told Officer Brown that, in his professional experience, Elise was completely capable of understanding her actions and was in the Hospital for behavioral issues unrelated to psychosis or intellect. Specifically, he said:

> "I feel that she is completely culpable. She is aware of what she is doing. It is behavior. So I am, I am 100% convinced that this is behavior and not psychosis. And that's me working here for six years. I've got enough evidence ... enough experience to be able to make that assessment."

45. Nurse Johnson told Officer Brown that Elise was admitted into the behavioral unit of the Hospital for suicidal ideations. Referring to Elise, and contradicting the medical determination by the admitting medical provider, Nurse Johnson said "she is not here for psychosis" and "there is no psychosis involved."

46. When Officer Brown asked Nurse Johnson whether Elise should stay in the behavioral unit or go to jail, Nurse Johnson said he would think about it while Officer Brown spoke with Elise.

47. When Officer Brown spoke with Elise, Elise: (1) did not know her age; (2) did not know her address; (3) did not know how long she had been in the behavioral unit; (4) informed Officer Brown she was a sick person; and (5) informed Officer Brown that the voices in her head, which she believed to be real, told her she stunk, and contributed to her violent outbursts.

48. After Officer Brown spoke with Elise, Nurse Johnson told Officer Brown that Elise's conduct was strictly behavioral and not related to psychosis or any other medical reason. He said, referring to Elise: "So, I have to be concerned for everyone else, and she is a problem. So, I am of the opinion that she needs to be removed."

49. Officer Brown then arrested Elise.

50. Officer Marbery transported Elise to the Jail.

**<u>Elise's 2024 stay at the Jail</u>**

51. Elise arrived at the Jail on December 18, 2024 with Officer Marbery.

52. While Officer Marbery was unlocking Elise's handcuffs, Elise tried to pull her arm away.

53. Officer Marbery asked Elise if she was trying to fight her. Elise responded "Yes."

54. Officer Marbery asked Elise if she would still fight with her if she tried to remove her handcuffs to place them behind her back. Elise said "Yes."

55. Officer Marbery asked Elise why she would fight with her. Elise said she did not know.

56. Officer Marbery then brought Elise into the pre-booking area of the Jail.

57. Police Department Sergeant Vaughn Cottam and Registered Nurse Macy Zachwieja met with Elise and Officer Marbery.

58. Officer Marbery informed Sgt. Cottam and Nurse Zachwieja that Elise had been combative.

59. Police Department deputies Gabrielle Persinger and Josh Hensley joined the group of officers interacting with Elise.

60. Jail nurse Macy Zachwieja asked Elise if she had suicidal thoughts and Elise said she did.

61. Nurse Zachwieja asked Elise more questions, but Elise kept answering that she did not know.

62. Questioning Elise's mental state, Sgt. Cottam began speaking with Elise.

63. Elise said she heard voices calling her "the b word."

64. Sgt. Cottam asked Elise what else the voices were saying and Elise said she did not know.

65. As officers in the Jail tried to remove Elise's handcuffs, Elise's arm struck one of the officers.

66. At least three of the officers (Lieutenant Kyle Bigelow, Sgt. Cottam, and Deputy Persinger) forced Elise to the ground and pinned her there.

67. Lt. Bigelow sat on Elise's legs and aided in handcuffing her.

68. The officers (now including Deputy Diego Magdelano and Deputy Persinger) then placed Elise in a restraint chair, which was brought by Deputy Jarin Akita.

69. Sgt. Cottam later learned from Officer Marbery that Elise had previously verbalized an intent to "fight" once her handcuffs were removed.

70. Sgt. Cottam was upset with Officer Marbery for not telling him sooner.

71. Deputy Persinger and Lt. Bigelow removed Elise's clothing and Deputy Persinger performed a body cavity search.

72. Police Department Registered Nurse Chantel Flake conducted a medical assessment of Elise.

73. On or about December 19, 2024, Leslie received a phone call from a social worker at the Jail, believed to be named Justin. Justin informed Leslie that Elise was in Jail.

74. Based on Leslie's call with Justin, Leslie called Forever Care's Alice Alefosio and informed Ms. Alefosio that Elise was in Jail.

75. Leslie went to the Jail and spoke with a male who identified himself as the sheriff. Leslie explained Elise's mental state to the sheriff, including the fact that Elise has the mentality of a six-year-old child.

76. Elise was then released to Leslie, and the sheriff told Leslie that Elise never should have been in the Jail in the first place.

**Washington County Case 241702691 ("Case 2691")**

77. On December 18, 2024, St. George City charged Elise with Assault in Washington County Justice Court (case 241702691).

78. At a February 28, 2025 hearing before Judge Ronald Read, Judge Read asked Elise if she was under the influence of anything that might keep her from participating. Elise's response was "Yeah." When Judge Read asked follow-up questions, Elise could not identify what medication she was on and simply said "ok."

79. The prosecutor, Robert Cossen, then informed Judge Read there were some "mental health issues" they were trying to resolve.

80. At a March 3, 2025 hearing before Judge Douglas Whitlock, Judge Whitlock found Elise indigent and released her as to Case 2691.

81. This case was dismissed on April 28, 2025.

**Elise's February 20, 2025 visit to the Hospital**

82. On February 20, 2025, staff from Forever Care took Elise to the Hospital because she had injured her head hitting it against a wall and Forever Care hoped to have Elise's medications reevaluated.

83. At the emergency department of the Hospital, Forever Care staff informed Hospital staff that Elise was intellectually challenged and violent.

84. Dr. Jared Cox evaluated Elise and noted she was suffering from acute psychosis and agitated behavior.

85. Dr. Cox noted that Elise underwent a crisis evaluation for her likely acute psychosis causing her aggressive behavior.

86. The Hospital's crisis evaluator spoke with Justin Brinkerhoff of the Hospital's behavioral medicine unit, which would not admit Elise because of the very December 2024 incidents involving Elise's conduct that Nurse Johnson improperly assessed and diagnosed, including as purely behavioral and not the product of any psychosis.

87. On information and belief, on or around February 20, 2025, one or more decision-makers of the Hospital's behavioral medicine unit refused to provide medical care to Elise without assessing whether it could safely or effectively do so.

88. On information and belief, on or around February 20, 2025, one or more decision-makers of the Hospital's behavioral medicine unit refused to assess whether it could safely or effectively provide medical care to Elise because of animus, dislike, frustration, resentment, or the like toward her stemming from the December 2024 stay described herein.

89. Nurse Johnson's improper assessment and diagnosis of Elise's December 2024 conduct in the Hospital improperly biased the Hospital's behavioral medicine department against her, which damaged her in 2025 by, among other things, preventing her from obtaining needed and available medical care in the Hospital during her February 2025 stay there.

90. During this time, the Hospital sometimes kept Elise in restraints.

91. During this time, the Hospital sometimes kept Elise in seclusion.

92. A Hospital psychiatry employee (on information and belief, Nurse Practitioner Lucas Haws) visited Elise in her room at the emergency department. Despite warnings from Forever Care staff, the psychiatry employee got too close to Elise and she slapped him in the face.

93. After evaluating Elise, the psychiatry employee informed Forever Care staff of the following plan: (1) Elise would be admitted to the Hospital to try new medication and stay under observation; (2) if the new medication worked, the Hospital would discharge Elise to Forever Care; and (3) if the new medication did not work, the Hospital would transfer Elise to the Utah State Hospital.

94. Police Department officer Rob Anderson, assigned to work at the Hospital, observed that Elise occasionally attempted to assault Hospital security staff. However, she did not focus on any particular security officer or any other specific individual.

95. Officer Anderson observed that Elise was not acting out of anger or against security personally. Rather, he perceived that Elise was not of clear mind and security personnel just happened to be the closest to her, making it easier for her to act out against them.

96. Officer Anderson saw that, once Elise was restrained and sedated, she was unable to assault Hospital staff. This observation factored into Anderson's decision whether to arrest Elise for assault.

97. Forever Care staff member Lovely Tuinukuafe informed Officer Anderson that Elise was diagnosed with bipolar disorder, schizophrenia, psychosis, and retardation caused by Kabuki syndrome.

98. Mr. Tuinukuafe informed Officer Anderson that Elise had become more violent since Forever Care had started caring for Elise in September 2024.

99. Mr. Tuinukuafe informed Officer Anderson why Forever Care had taken Elise to the emergency department.

100. Mr. Tuinukuafe informed Officer Anderson of the circumstances surrounding Elise's December 2024 arrest.

101. Based on assurances from Hospital staff that Elise would be taken care of consistently with the aforesaid admission plan, Forever Care staff left the Hospital.

102. After considering the situation, including the fact that Elise was sedated, Officer Anderson elected not to arrest Elise.

103. Later, Hospital staff advised Police Department Officer Ken Childs that Elise could be medically cleared and transported to the Jail for assault.

104. Hospital staff informed Officer Doug Iverson that Elise was no longer welcome at the Hospital.

105. Officer Iverson then arrested Elise and transported her to the Jail.

106. The next day, February 21, 2025, the director of Forever Care traveled to the Hospital to visit Elise.

107. Initially, the Hospital could not locate Elise or account for her whereabouts.

108. Hospital staff told the Forever Care director it had no record of Elise being admitted to the Hospital.

109. After about an hour of being unable to account for Elise's whereabouts or produce any documentation of her stay at the Hospital, Hospital staff informed the Forever Care director that Elise had been arrested.

110. Dr. Jared Cox's records from February 20, 2025 reflect his recommendations that: (1) Elise needed one-on-one observation for safety and impulsive behavior; (2) it was not appropriate to admit Elise into behavioral medicine for ongoing care; (3) it was appropriate to discharge Elise to a group home or a "PICU bed up north;" and (4) behavioral health crisis workers and hospital care management should provide follow-up resources and coordinate disposition.

111. Such records also reflect that Dr. Cox could not perform a review of Elise's systems for thought content due to her profound intellectual disability.

112. Such records also reflect that Dr. Cox diagnosed Elise with acute psychosis.

113. Hospital records reflect that crisis worker Ingrid Nalder (who, on information and belief, worked at the Hospital as an employee) completed an "Emergency Application for Involuntary Commitment" form that stated Elise "is unsafe to return home" and "a danger to self and others."

114. The records of LCSW Summer Westmoreland Warden (who worked at the Hospital) from February 20, 2025 reflect that, after consultation with Dr. Cox and PA Justin Brinkerhoff, Elise would remain in the emergency department until she could have a psychiatric consultation. Such records also reflect Elise was "placed on the queue for a PICU bed up North."

115. Dr. Sorensen's records from February 20, 2025 reflect: (1) Elise was sedated and fairly compliant; (2) if oral medications did not work by the next day, Elise would be transferred to American Fork or some other facility; (3) the police were willing to take Elise into custody that night; (4) Elise attempted to strike him but did not exhibit aggressive behavior if he gave her space; (5) he was able to complete his evaluation of Elise once she was restrained; and (6) behavioral medicine would not admit Elise but the daytime psychiatrist would evaluate her.

116. Dr. Sorensen's records from February 20, 2025 also reflect that Hospital psychiatry "evaluated [Elise] briefly" and formed a plan "to try some oral medi[c]ations today and then tomorrow morning and see if she is compliant and more stabilized."

117. Less than two hours after psychiatry visited with Elise "briefly," and after providing her only the first of two potentially stabilizing courses of medication, the Hospital (through Dr. Sorensen) released Elise to law enforcement.

118. Per Dr. Sorensen's February 20, 2025 record, referring to law enforcement, "[h]opefully they will be able to help her get stabilized on her medication."

119. Dr. Sorensen also signed a "Certificate for Emergency Commitment to Local Mental Health Authority" on February 20, 2025, which reflected that Elise was "disconnected from reality and a danger to herself."

120. Dr. Sorensen also signed a "Medical Clearance Form" on February 20, 2025 indicating Elise was cleared for incarceration with suicide precautions.

121. At the time he signed the form referenced in the immediately preceding paragraph, Dr. Sorensen perceived that Elise was a danger to herself.

122. NP Lucas Haws' records from February 20, 2025 reflect that Elise was not oriented to place or person and was impaired by a profound intellectual disability.

**<u>Elise's 2025 stay at the Jail</u>**

123. Elise arrived at the Jail on February 20, 2025.

124. At the Jail, Deputy C. Peralta and Deputy Kenleigh Weaver conducted Elise's intake.

125. As Deputy Weaver was attempting to explain a property inventory sheet to Elise, Elise slapped Deputy Weaver.

126. Deputy Peralta and Deputy Weaver took Elise to the ground, with the aid of Sgt. Marc VanDam.

127. Deputy Weaver then conducted a body cavity search.

128. Upon information and belief, Jail staff kept Elise isolated and secluded for purposes of discipline and/or convenience.

129. Upon information and belief, Jail staff kept Elise restrained for purposes of discipline.

130. Upon information and belief, Jail staff kept Elise restrained for purposes of convenience.

131. Upon information and belief, Jail staff did not allow Elise full and normal visitation and/or contact with family, despite allowing other inmates to do so.

132. Upon information and belief, Jail staff did not allow Elise full and normal visitation and/or contact with friends, despite allowing other inmates to do so.

133. Upon information and belief, Jail staff did not allow Elise full and normal visitation and/or contact with family due to her disability.

134. Upon information and belief, Jail staff did not allow Elise full and normal visitation and/or contact with friends due to her disability.

135. Upon information and belief, on at least one day during Elise's 2025 detention in the Jail, Jail staff kept Elise in isolation more than 23 hours.

136. Upon information and belief, during Elise's 2025 detention in the Jail, Jail staff kept Elise in a small, single-person cell that contained no natural light and no camera.

137. Upon information and belief, Jail staff did not provide Elise with opportunities for exercise during her 2025 detention in the Jail.

138. Upon information and belief, Jail staff did not provide Elise with opportunities for social interaction during her 2025 detention in the Jail.

139. Upon information and belief, Jail staff did not provide Elise with opportunities for environmental stimulation during her 2025 detention in the Jail.

140. Upon information and belief, Jail staff did not provide Elise with meaningful periodic reviews of her isolation.

141. On February 21, 2025, Jail staff member Justyn Chris noted that Elise "is lower function and does not appear to have the ability/capacity to manage her impulses."

142. On February 21, 2025, Chris also noted that Elise was "to remain in booking" and he would "see if we can reach out to her care facility about their plan moving forward."

143. On February 21, 2025, Jail staff observed Elise "forcefully and repeatedly" hitting her forehead on her cell window. Accordingly, Jail staff placed Elise in a restraint chair for a period of time.

144. Later that day, Jail staff threatened Elise with Oleoresin Capsicum (pepper) spray if she did not comply with orders. Jail staff then placed Elise in a restraint chair for at least the second time that day.

145. Because Jail staff did not adequately secure Elise in the restraint chair, Elise was able to begin removing her restraints.

146. As Jail staff began placing Elise back into the restraint chair, Elise weakly kicked toward Deputy Kevin Larsen, which prompted Deputy Lacie Adams to "administer[ ] two closed fist distraction blows to [Elise's] abdomen."

147. The "distraction blows" referenced in the immediately preceding paragraph were hard punches.

148. The "distraction blows" referenced in the immediately preceding paragraph were punches thrown to hurt Elise.

149. The "distraction blows" referenced in the immediately preceding paragraph caused Elise to experience physical pain and suffering.

150. The “distraction blows” referenced in the immediately preceding paragraph caused Elise to experience mental pain and suffering.

151. On March 9, 2025, at the request of Dr. Grygla, Dr. Gregory W. Osmond at the Hospital performed a laboratory analysis of Elise’s urine.

152. The urine analysis revealed that Elise had a urinary tract infection involving Escherichia coli and Aerococcus urinae.

153. That same day, Dr. Grygla prescribed Elise a medication called Ciprofloxacin HCL (“Cipro”).

154. At the time he prescribed Cipro, Dr. Grygla knew or should have known that Elise was also taking Olanzapine.

155. Cipro inhibits the CYP1A2 enzyme pathway through which Olanzapine is metabolized. Consequently, administering Cipro and Olanzapine together can impair the metabolism of Olanzapine, increase its concentration in the body, and cause clinically significant toxicity.

156. Cipro has a well-known adverse drug-drug interaction with Olanzapine.

157. Cipro is not a reliable or effective treatment for Aerococcus urinae infections.

158. The concurrent administration of Cipro and Olanzapine impaired Elise’s ability to metabolize Olanzapine and caused or substantially contributed to its accumulation in her body. That interaction caused or substantially contributed both to the toxic Olanzapine level identified at autopsy and Elise’s death.

159. Dr. Grygla knew or should have known of the interaction between Cipro and Olanzapine and the resulting risk that Olanzapine would accumulate in Elise’s body to a toxic level.

160. On March 10, 2025, Jail staff member LCSW Jon Worlton noted that he "spoke with Alice A from the client's previous group home last week," referring to Alice Alefosio of Forever Care.

161. On March 10, 2025, Worlton also noted he "[w]ill have [clinician] Dean [Monson] evaluate" Elise and will "[c]ontinue with Case Management Services."

162. On March 10, 2025, Worlton also noted he would "[c]ontinue to follow-up with the courts, treatment providers, etc." and would "[c]ontact the County Attorney's office to inquire about plans for prosecution or competency."

163. On March 10, 2025, Worlton facilitated a video visit between Elise and her parents.

164. On March 11, 2025, APRN Dean Monson evaluated Elise's stability for release from the Jail.

165. On March 19, 2025, Worlton facilitated a visit with Elise and Alice from Forever Care. Alice reported that Forever Care was still willing to provide care for Elise.

166. On March 19, 2025, Worlton noted he would "[w]ork with admin, county attorney, and [Elise's] parents to see what can be done regarding release from jail so that she can return to her program."

167. On March 19, 2025, Worlton called Leslie and said: "Call whoever you need to call, but you need to get [Elise] out of here. My hands are tied."

168. On February 20, 2025, as soon as Leslie learned the Jail took custody of Elise, Leslie went to the Jail with the hope of securing Elise's release from the Jail like she had in December 2024.

169. This time, when Leslie told Jail staff Elise had Kabuki syndrome and the mental capacity of a 6-year-old child, she was told to wait in the Jail waiting room.

170. Leslie waited there for hours but no Jail staff made themselves available to talk to her.

171. At or around 5:00 p.m., the Jail staff member behind the reception counter closed the partition between the reception desk and the waiting area and turned out the lights in the waiting area so Leslie was left sitting alone in the dark.

172. Leslie left the Jail on February 20 without having had the opportunity to further discuss Elise or her conditions with Jail staff.

173. Between February 20 and March 21, 2025, Steve and Leslie made repeated requests to Jail staff to allow them to visit Elise.

174. Between February 20 and March 21, 2025, Steve and Leslie made repeated requests to Jail staff to allow them to talk to Elise.

175. Between February 20 and March 21, 2025, Steve and Leslie informed Jail staff that Elise had the mental capacity of a 6-year-old child.

176. Between February 20 and March 21, 2025, Steve and Leslie informed Jail staff that Elise could not understand where she was, why she was there, and why her family had seemingly abandoned her.

177. Throughout Elise's detention, numerous Jail employees and supervisors knew that Jail staff kept Elise isolated, repeatedly restrained her, denied her ordinary recreation and social interaction, and substantially restricted her contact with her family.

178. The conditions of Elise's confinement continued across numerous shifts and involved numerous Jail employees. Those conditions could not have continued for approximately one month without the knowledge, authorization, or acquiescence of Jail supervisors and administrators.

179. Upon information and belief, Jail supervisors received and reviewed records concerning Elise's placement in isolation, repeated use of restraints, conditions of confinement, and interactions with Jail staff, but did not alter those conditions or provide Jail staff with additional direction regarding her care.

180. At a February 28, 2025 hearing about criminal charges brought against Elise, Steve informed a judge, in front of the prosecuting attorney, that Elise was mentally challenged and could not understand the charges against her or the legal proceedings in which she was forced to participate.

181. Elise died at the Jail on March 21, 2025 at approximately 2:19 a.m.

182. Elise was alone in her cell when she died.

183. Early in the morning of March 21, 2025, Worlton and another Jail representative went to Steve and Leslie's home and informed Leslie that Elise had passed away at the Jail during the night.

184. When Leslie inquired about the details of Elise's passing, the Jail representatives informed her they were not at liberty to discuss those details.

185. Dr. Amanda L. Ho performed Elise's autopsy on March 22, 2025.

186. According to Dr. Ho, Elise died from the toxic effects of Olanzapine—effectively an Olanzapine overdose.

187. Olanzapine is an anti-psychotic medication.

188. Jail staff had dispensed Olanzapine to Elise at the Jail.

189. During Elise's entire stay at the Jail in 2025, she was not adjudged guilty of any crime in accordance with due process of law.

190. During her entire 2025 stay at the Jail, Elise was a pretrial detainee.[1]

191. During her entire 2025 stay at the Jail, Elise was not legally subject to punishment by any defendant.

**Washington County Case 251500297 ("Case 0297")**

192. On February 21, 2025, the State of Utah charged Elise with Assault by Prisoner in St. George District Court (case 251500297).

193. At a February 21, 2025 hearing before Judge Ryan Christiansen, a Jail staff member informed the court that Elise was "unable to come to court today."

194. No Jail staff member informed Leslie about the hearing.

195. No Jail staff informed Steve about the hearing.

196. No Jail staff attempted to facilitate Elise's attendance at the hearing.

197. On February 26, 2025, Deputy Washington County Attorney Lane Wood filed a "Petition for Inquiry into Sanity and Competency of Defendant" in Case 0297 and stated that, based on his discussions with "Alice Alefosio from Forever Care," he "believes that the Defendant cannot understand the charges against her and likely could not assist in preparing her defense."

198. At a February 27, 2025 hearing before Judge Eric Gentry, prosecutor Brian Sheide informed the court that Elise was "very special needs" and lives in a "group home."

199. Judge Gentry asked Mr. Sheide if he wanted to keep Elise in Jail to determine competency.

200. Mr. Sheide indicated a new court date should be set for the next week.

[1] Hereafter, with respect to Elise, plaintiffs use the terms "inmate" and "detainee" synonymously.

201. At a March 5, 2025 hearing before Judge Eric Gentry, Jail staff informed the Court that Elise was not present and had been deemed incompetent.

202. On or about March 13, 2025, an email from the Utah State Hospital was filed in Case 0297 stating "Renee Wilkinson will be providing the Inquiry into Sanity of Defendant[.]"

203. Case 0297 was dismissed in April 2025.

**Washington County Case 251500312 ("Case 0312")**

204. On February 24, 2025, the State of Utah charged Elise with Assault by Prisoner in St. George District Court (case 251500312).

205. On March 20, 2025, Deputy Washington County Attorney Brian Sheide filed a motion to release Elise from the Jail into the custody of the staff of Forever Care. The basis for the motion was "that the defendant's mental state of health and well-being is suffering and remains at risk while incarcerated at [the Jail]."

206. Case 0312 was dismissed in April 2025.

**Washington County's prior notice of deficiencies at the Jail**

207. Years before Elise's detention, the County was sued under 42 U.S.C. § 1983 regarding its treatment of another detainee at the same Jail. *See Crowson v. Washington County*, 983 F.3d 1166 (10th Cir. 2020).

208. The record described in *Crowson* reflected that the Jail lacked written policies or procedures regarding core aspects of inmate medical care and provided Jail nurses unsupervised, untrained discretion when evaluating and responding to inmates with serious medical conditions.

209. The record described in *Crowson* also reflected that the Jail lacked written policies governing the placement of inmates in observation cells and their evaluation after being placed in those cells.

210. As a result of the *Crowson* litigation, the County, the Sheriff, and other policymakers responsible for the operation and administration of the Jail knew before Elise's detention that the failure to provide appropriate written policies, protocols, training, and supervision for Jail employees responding to inmates with serious medical or mental-health conditions created a substantial risk of constitutional injury.

211. Worlton, who participated in the Jail's response to Elise, also served as the Jail's health-services administrator and was involved in providing mental-health services to inmates during the events at issue in *Crowson*.

212. Upon information and belief, despite the deficiencies identified during the *Crowson* litigation, the County failed to adopt adequate written policies or protocols governing the placement of detainees with serious mental disabilities in isolation, the duration and conditions of such isolation, the periodic review of their continued isolation, or the use of restraints against them.

213. Upon information and belief, the County also failed to provide Jail employees with adequate training regarding how to manage disability-related behaviors, when to use isolation or restraints, how to periodically evaluate the continued need for such measures, and how to provide detainees with serious mental disabilities access to recreation, social interaction, environmental stimulation, and family contact.

## FIRST CAUSE OF ACTION:

**Violation of Fourteenth Amendment Substantive Due Process Rights**
**(Brought by plaintiffs under 42 U.S.C. § 1983 against the County and Deputy Adams)**

214. Plaintiffs incorporate by reference all preceding paragraphs as though set forth verbatim herein.

215. The Fourteenth Amendment to the United States Constitution protects against arbitrary deprivations of life, liberty, or property, regardless of the procedural fairness of such deprivations.

216. Elise had a right under the Fourteenth Amendment to be free from excessive force as a pretrial detainee.

217. Elise had a liberty interest in being free from incarceration absent a criminal conviction (i.e., freedom from pretrial restraint of liberty).

218. Elise had a liberty interest in being free from restraint that imposes atypical and significant hardship in relation to the ordinary incidents of incarcerated life.

219. Elise had a substantive due process right to humane conditions of confinement and familial association.

220. Restrictions on Elise's contact with her family that were intended as punishment, were not reasonably related to a legitimate governmental objective, or intentionally interfered with her protected familial relationships, violated the Fourteenth Amendment.

221. Individuals (like Elise) with a known history of serious mental illness have a clearly established right not to be subjected to prolonged, indefinite solitary confinement—without penological justification—by an official who was aware of that history and the risks that solitary confinement poses to someone with those health conditions.

222. Leslie and Steve have substantive due process rights to familial association with Elise.

The Estate against the County

223. The conditions in which the Jail confined Elise were sufficiently serious to deprive her of basic human needs like exercise, recreation, visitation, and familial association (i.e., the minimal civilized measures of life's necessities).

224. Jail staff confined Elise to a solitary cell for long periods of time without basic human needs like exercise, recreation, visitation, familial association, social interaction, and environmental stimulation.

225. Jail staff did not provide Elise with a periodic review of her isolation and segregation.

226. Jail staff were deliberately indifferent to Elise's health and safety.

227. Jail staff were aware of Elise's serious mental and physical health conditions.

228. Jail staff were aware of the risks that solitary confinement poses to someone with Elise's serious mental and physical health conditions.

229. Elise's serious mental and physical health conditions were obvious.

230. Jail staff imposed restrictions and conditions of confinement on Elise that amounted to punishment and were not reasonably related to a legitimate government interest.

231. Jail staff deprived Elise of rights and privileges given to other inmates in the Jail, such as recreation, visitation, phone calls, familial association, social interaction, environmental stimulation, and other human contact, without a legitimate penological interest, solely because of her disability.

232. Jail staff subjected Elise to excessive force, such as when Deputy Adams twice punched Elise hard in the abdomen.

233. The County, as owner, operator or administrator of the Jail, had a duty and obligation to create, enforce, supervise the administration of, and offer training on policies, procedures, or customs, whether formal or informal, regarding what Jail staff should do when Jail staff takes custody of a person with serious mental disabilities like Elise.

234. Jail staff's treatment of Elise was pursuant to the County's official policies, customs, and practices.

235. Upon information and belief, the County had an official policy, custom, and/or practice of requiring segregation and isolation of mentally ill inmates for convenience.

236. Upon information and belief, the County had an official policy, custom, and/or practice of not providing periodic reviews to segregated and isolated mentally ill inmates.

237. Upon information and belief, the County had an official policy, custom, and/or practice of not allowing mentally ill inmates to have access to things like recreation, visitation, phone calls, familial association, social interaction, environmental stimulation, and other human contact.

238. Upon information and belief, the County failed to train its employees how to handle mentally ill inmates like Elise.

239. The County exhibited gross deficiencies in staffing and procedures during the time it was responsible for Elise.

240. Upon information and belief, the County's aforementioned policies, customs, and practices (including its training failures) were the moving force behind, and directly caused, the deprivation of Elise's rights.

241. The County's policies, customs, and practices of isolating mentally disabled inmates for convenience, failing to provide meaningful periodic reviews of their isolation, and denying

them ordinary recreation, social interaction, environmental stimulation, and family contact directly caused the unconstitutional conditions of Elise's confinement.

242. The County's failure to provide appropriate policies, training, and supervision regarding the management of inmates with serious mental disabilities caused Jail staff to respond to Elise's disability-related behaviors with prolonged isolation, repeated restraints, deprivation of basic needs, and unnecessary force.

243. Upon information and belief, the County adopted the aforementioned policies, customs, and practices (including its training failures) with deliberate indifference to the rights of inmates like Elise.

244. Upon information and belief, the Sheriff and other County policymakers responsible for the operation and administration of the Jail knew to a moral certainty that Jail employees would confront situations involving detainees with serious mental disabilities like Elise.

245. Such situations present the County's employees with a difficult choice of the sort that training or supervision will make less difficult (e.g., how to manage Elise's symptoms, whether to isolate her, whether to restrain her, and whether to strike her).

246. County employees making the wrong choice in such situations will frequently cause the deprivation of a citizen's constitutional rights (e.g., a person like Elise will be deprived of basic human needs like recreation, visitation, phone calls, familial association, social interaction, environmental stimulation, and other human contact).

247. Upon information and belief, the County had actual or constructive notice that its actions or failure to act regarding its obligation to create, enforce, or offer training on policies, procedures, or customs addressing what Jail staff should do when given custody of an inmate

like Elise was substantially certain to result in serious harm to inmates like Elise, and the County consciously or deliberately chose to disregard this specific risk of harm.

248. The deprivation of rights Elise experienced was a highly predictable or plainly obvious consequence of the County's action or inaction.

249. The combined acts or omissions of several Jail staff members acting under the County's systemic policies, customs, and/or practices violated Elise's constitutional rights.

250. The County's failures described herein, which were systemic in nature (i.e., not necessarily dependent upon unconstitutional conduct by any particular subordinate), constituted and/or caused constitutional violations for which the County is liable.

251. The County's conduct caused damage to Elise, Leslie, and Steve.

252. As explained herein, during Elise's 2025 detention in the Jail, the County forced separation between Elise and her parents.

253. Jail staff repeatedly denied Steve and Leslie's requests to visit or speak with Elise despite knowing that Steve and Leslie were Elise's parents and that Elise's disabilities prevented her from understanding why she had been separated from them.

254. Jail staff's denial of Steve and Leslie's requests was intentional and was undertaken pursuant to the County's policy, custom, or practice of denying mentally disabled detainees visitation, telephone calls, familial association, and other human contact.

255. The County was aware that Steve and Leslie were attempting to contact Elise.

256. The County, through its Jail employees and pursuant to its policies, customs, and practices, directed its conduct at Elise's relationship with Steve and Leslie with knowledge that such conduct would adversely impact those relationships.

257. The County, through its Jail employees and pursuant to its policies, customs, and practices, intended to deprive Steve and Leslie of their protected relationship with Elise.

258. Prior to Elise's incarceration, Steve and Leslie spoke with Elise almost every day (sometimes multiple times per day).

259. Prior to Elise's incarceration, Steve and Leslie would bring Elise to their home almost every weekend.

260. Balancing the interests involved, the County unduly burdened Steve and Leslie's protected relationship with Elise and/or effected an unwarranted intrusion into that relationship.

261. The County's forced separation was not rationally related to legitimate penological interests.

262. The County's conduct caused damages to Steve and Leslie.

<u>The Estate against Deputy Adams</u>

263. Deputy Adams used objectively unreasonable and excessive force against Elise when she forcefully struck Elise in the abdomen twice with a closed fist while Elise was restrained.

264. Such force was more severe than necessary and constituted punishment.

265. Elise's resistance, if any, was passive and minimal.

266. Viewed objectively and from the perspective of a reasonable officer at the scene, Deputy Adams's use of force was unreasonable because Elise was restrained, her resistance and the threat she presented were minimal, and the force used was disproportionate to any legitimate need for force.

267. Deputy Adams's use of force was not rationally related to a legitimate nonpunitive governmental purpose and, in any event, was excessive in relation to any such purpose.

268. Deputy Adams's conduct caused damage to Elise.

## <u>SECOND CAUSE OF ACTION</u>:

**Violation of Fourteenth Amendment Procedural Due Process Rights**
**(Brought by the Estate under 42 U.S.C. § 1983 against the County)**

269. Plaintiffs incorporate by reference all preceding paragraphs as though set forth verbatim herein.

270. The Fourteenth Amendment to the United States Constitution protects against deprivations of life, liberty, or property without due process of law.

271. Elise's interests in life and liberty were deprived without due process because her pretrial detention amounted to punishment without notice and/or a hearing.

272. Elise's interests in life and liberty were deprived without due process when the Jail placed her in solitary confinement without notice, a hearing, or periodic review.

273. Elise's interests in life and liberty were deprived without due process when the Jail imposed conditions like solitary confinement on Elise with the intent to punish.

274. Elise's interests in life and liberty were deprived without due process because her pretrial detention was excessive in relation to, and bore no reasonable relationship to, a legitimate governmental objective.

275. Elise's interests in life and liberty were deprived without due process because her pretrial detention failed to meet her minimal health and safety needs.

276. Elise's interests in life and liberty were deprived without due process because she was subjected to an atypical and significant hardship in relation to the ordinary incidents of incarcerated life.

277. Elise's interests in life and liberty were deprived without due process because she was held in segregation without notice or opportunity to be heard with respect to the nature or duration of her confinement.

278. Elise's interests in life and liberty were deprived without due process because she was not given an adequate competency hearing.

279. Jail staff's treatment of Elise was pursuant to the County's official policies, customs, and practices.

280. Upon information and belief, the County had an official policy, custom, and/or practice of punishing mentally ill inmates without notice and/or a hearing.

281. Upon information and belief, the County had an official policy, custom, and/or practice of placing mentally ill inmates in segregation and isolation without notice, a hearing, or periodic review.

282. Upon information and belief, the County's aforementioned policies, customs, and practices (including its training failures) were the moving force behind and directly caused the deprivation of Elise's rights.

283. The County's policies, customs, and practices of placing mentally disabled inmates in segregation and isolation without notice, a hearing, or meaningful periodic review directly caused the deprivation of Elise's procedural due process rights.

284. Upon information and belief, the County adopted the aforementioned policies, customs, and practices (including its training failures) with deliberate indifference to the rights of inmates like Elise.

285. Upon information and belief, the County had actual or constructive notice that its actions or failure to act regarding its obligation to create, enforce, or offer training on policies,

procedures, or customs addressing what Jail staff should do when given custody of an inmate like Elise was substantially certain to result in serious harm to inmates like Elise, and the County consciously or deliberately chose to disregard this specific risk of harm.

286. The deprivation of rights Elise experienced was a highly predictable or plainly obvious consequence of the County's action or inaction.

287. The combined acts or omissions of several Jail staff members acting under the County's systemic policies, customs, and/or practices violated Elise's constitutional rights.

288. The County's failures described herein, which were systemic in nature (i.e., not necessarily dependent upon unconstitutional conduct by any particular subordinate), constituted and/or caused constitutional violations for which the County is liable.

289. The County's conduct caused damage to Elise.

## THIRD CAUSE OF ACTION:

**Violation of the Americans with Disabilities Act (the "ADA"), the Rehabilitation Act, and Affordable Care Act (the "ACA").**
**(Brought by the Estate against the County and the Hospital)**

290. Plaintiffs incorporate by reference all preceding paragraphs as though set forth verbatim herein.

291. Both the ADA and the Rehabilitation Act prohibit disability-based discrimination by public accommodations and public entities that receive federal assistance. The ADA prohibits discrimination "by reason of" disability, while the Rehabilitation Act prohibits discrimination "solely by reason of" disability. *See* 42 U.S.C. §§ 12132, 12182; 29 U.S.C. § 794; 28 C.F.R. §§ 35.152, 36.104, 36.201; 45 C.F.R. §§ 84.21; 84.52.

292. Similarly, the ACA provides discrimination protection. *See* 42 U.S.C. § 18116(a).

293. Elise was a qualified individual with one or more disabilities that substantially limited her major life activities and impacted the way she interacted with others.

294. Elise's disabilities and needs for accommodation were obvious.

295. Elise's physical behaviors were caused by and inextricably linked to her disabilities. Thus, the County and the Hospital punished her for what were essentially symptoms and manifestations of her disabilities.

The County

296. The Jail, which is operated by the County, is a public entity that receives federal assistance.

297. As described herein, the County denied Elise participation in and/or the benefits of its services, programs, or activities at the Jail by reason of her disability, in violation of the ADA, and solely by reason of her disability, in violation of the Rehabilitation Act.

298. As described herein, the County failed to make reasonable accommodations to Elise's needs as a disabled person.

299. The County had a practice and policy of excluding disabled persons like Elise from participation in and/or the benefits of the Jail's services, programs, or activities by reason of their disabilities, in violation of the ADA, and solely by reason of their disabilities, in violation of the Rehabilitation Act and the ACA.

300. The County failed to train its Jail employees on how to comply with the ADA when given custody of a person with serious mental disabilities like Elise.

301. The County intentionally discriminated against Elise (i.e., acted with deliberate indifference to the strong likelihood that its actions or policies would result in a violation of federally protected rights).

302. The County's failure to make reasonable modifications necessary to adjust for Elise's unique needs constitutes intentional discrimination.

303. The County was aware that the Jail would house inmates with serious mental disabilities like Elise.

304. The County was aware that, if it did not train its Jail employees on how to comply with the ADA, ACA, or Rehabilitation Act when taking custody of a person with serious mental disabilities like Elise, harm to federally protected rights was substantially likely.

305. The County failed to act on the aforementioned substantial likelihood with deliberate indifference to the consequences.

306. The County had a duty to modify its practices to ameliorate the harms of prolonged solitary confinement on Elise, and the County breached that duty.

307. The County had a duty to evaluate Elise's needs and the accommodations necessary to ensure she had reasonable access to the Jail's services, and the County breached that duty.

308. The County had a duty to engage in a remedial interactive process aimed at finding reasonable accommodations for Elise, and the County breached that duty.

309. The County's actions and failures to train caused harm to Elise, which entitles her Estate to compensatory damages.

<u>The Hospital</u>

310. The Hospital is a public accommodation that receives federal assistance.

311. As described herein, the Hospital denied Elise participation in and/or the benefits of its services, programs, or activities at the Hospital by reason of her disability, in violation of the ADA, and solely by reason of her disability, in violation of the Rehabilitation Act and ACA.

312. As described herein, the Hospital failed to make reasonable accommodations to Elise's needs as a disabled person.

313. The Hospital had a practice and policy of excluding disabled persons like Elise from participation in and/or the benefits of their services, programs, or activities by reason of their disabilities, in violation of the ADA, and solely by reason of their disabilities, in violation of the Rehabilitation Act and ACA.

314. The Hospital failed to train its employees on how to comply with the ADA, ACA, and Rehabilitation Act when given custody of a person with serious mental disabilities like Elise.

315. The Hospital intentionally discriminated against Elise (i.e., acted with deliberate indifference to the strong likelihood that its actions or policies would result in a violation of federally protected rights).

316. The Hospital's failure to make reasonable modifications necessary to adjust for Elise's unique needs constitutes intentional discrimination.

317. The Hospital was aware that it would treat people with serious mental disabilities like Elise.

318. The Hospital was aware that, if it did not train its employees on how to comply with the ADA, ACA, and the Rehabilitation Act when given custody of a person with serious mental disabilities like Elise, harm to federally protected rights was substantially likely.

319. The Hospital failed to act on the aforementioned substantial likelihood with deliberate indifference to the consequences.

320. The Hospital had a duty to evaluate Elise's needs and the accommodations necessary to ensure she had reasonable access to the Hospital's services, and the Hospital breached that duty.

321. The Hospital had a duty to engage in a remedial interactive process aimed at finding reasonable accommodations for Elise, and the Hospital breached that duty.

322. The Hospital's actions and failures to train caused harm to Elise, which entitles her Estate to compensatory damages.

323. The Hospital's conduct caused damage to Elise.

## FOURTH CAUSE OF ACTION:

**Medical malpractice and willful misconduct**
**(Brought by the Estate against the Hospital, Dr. Grygla, Dr. Sorensen, and Nurse Johnson)**

324. Plaintiffs incorporate by reference all preceding paragraphs as though set forth verbatim herein.

325. By accepting and treating Elise as a patient, the Hospital owed Elise the duties of care applicable to a hospital under the circumstances described herein.

326. By undertaking to provide nursing care to Elise, Nurse Johnson owed Elise the duties of care applicable to a registered nurse under the circumstances described herein.

327. By undertaking to diagnose and treat Elise, Dr. Grygla owed Elise the duties of care applicable to a physician under the circumstances described herein.

328. By undertaking to diagnose and treat Elise, Dr. Sorensen owed Elise the duties of care applicable to a physician under the circumstances described herein.

329. Such duties included, but were not limited to, the duty to appropriately evaluate and treat Elise, the duty to exercise such care as they know (or should know) Elise's conditions require, the duty to protect Elise from foreseeable harms, the duty to exercise reasonable care in supervising Elise, the duty to provide law enforcement with appropriate instructions and accurate information upon learning law enforcement was arresting Elise, the duty to prescribe Elise proper medications, and the duty to appropriately discharge Elise with medications and instructions.

330. The Hospital, Dr. Grygla, Dr. Sorensen, and Nurse Johnson also had a duty to comply with state and federal laws regarding restraints, seclusions, and inappropriate client behavior. *See* 42 U.S.C. §§ 290ii, 10841; 42 C.F.R. §§ 482.13, 483.450; Utah Admin. Code R432-101-15, -17, -23; Utah Code Ann. §§ 26B-5-306, -337.

331. The Hospital, Dr. Grygla, Dr. Sorensen, and Nurse Johnson breached the duties applicable to them through their respective acts and omissions as described herein.

332. The breaches by the Hospital, Dr. Grygla, Dr. Sorensen, and Nurse Johnson caused or contributed to the injuries and damages sustained by Elise in an amount to be proven at trial.

333. The Hospital, Dr. Grygla, Dr. Sorensen, and Nurse Johnson acted willfully and/or recklessly, with awareness that an injury to Elise would likely result.

## FIFTH CAUSE OF ACTION:

**Wrongful Death**
**(Brought by plaintiffs against the Hospital, Dr. Grygla, Dr. Sorensen, and Nurse Johnson)**

334. Plaintiffs incorporate by reference all preceding paragraphs as though set forth verbatim herein.

335. Elise's death was caused by the wrongful act or neglect of the Hospital, Dr. Grygla, Dr. Sorensen, and Nurse Johnson, as described above.

336. Pursuant to Utah Code Ann. § 78B-3-106, plaintiffs (as heirs and/or personal representatives of the Estate) bring an action for damages.

## SIXTH CAUSE OF ACTION:

**Unnecessary rigor**
**(Brought by the Estate against the County)**

337. Plaintiffs incorporate by reference all preceding paragraphs as though set forth verbatim herein.

338. Article 1, section 9 of the Utah Constitution provides that "[p]ersons arrested or imprisoned shall not be treated with unnecessary rigor."

339. The County subjected Elise to needlessly harsh, degrading, and/or dehumanizing treatment, as described herein. Such treatment was clearly excessive or deficient and unjustified.

340. The County subjected Elise to a substantial risk of serious injury for which there was no reasonable justification at the time.

341. The County's actions presented an obvious and known serious risk of harm to Elise and the County, knowing that risk, acted without reasonable justification.

342. The County flagrantly violated Elise's constitutional rights.

343. Remedies under other state and federal laws do not redress Elise's injuries because the unnecessary rigor clause has no federal counterpart and provides broader protection than the prohibition against cruel and unusual punishment.

344. Equitable relief, like an injunction, will not redress Elise's injuries because she has already passed away.

345. The County's conduct caused damage to Elise.

## SEVENTH CAUSE OF ACTION:

**Intentional Infliction of Emotional Distress**
**(Brought by the Estate, Steve, and Leslie against the Hospital)**

346. Plaintiffs incorporate by reference all preceding paragraphs as though set forth verbatim herein.

347. The Hospital's conduct described herein, including causing Elise to be arrested and transported to the Jail despite knowing that she suffered from profound intellectual disabilities, acute psychosis, an unstable emergency medical condition, and that she could not receive the

type or level of care she needed in the Jail, was extreme, outrageous, and offensive to generally accepted standards of decency and morality.

348. The Hospital intended to cause Elise severe emotional distress or acted with reckless disregard of the likelihood that its conduct would cause her severe emotional distress.

349. The Hospital owed duties to Elise, as described herein.

350. The Hospital knew or should have known that its conduct would likely cause Elise to suffer severe emotional distress.

351. The Hospital's conduct caused Elise to suffer severe emotional distress with severe mental and physical manifestations.

352. The Hospital also owed duties to Steve and Leslie to not affirmatively act in a manner that recklessly causes them physical harm because of their interactions with Elise.

353. The Hospital's interactions with Elise are of the type that warrant a special, limited duty to refrain from causing severe emotional distress to Steve and Leslie by mistreating Elise.

354. The Hospital's interactions with Elise necessarily implicate Steve and Leslie's well-being.

355. There is an especially likely risk that the Hospital's mistreatment of Elise will result in severe emotional distress to Steve and Leslie, including because of Elise's dependency on them for her well-being.

356. The public policy supports the existence of the special, limited duty described herein.

357. The Hospital knew or should have known that its conduct would likely cause Leslie and Steve to suffer severe emotional distress.

358. Because of the Hospital's conduct (e.g., damaging the parent-child relationship), Steve and Leslie suffered severe emotional distress with severe mental and physical manifestations.

359. Steve and Leslie suffer horrific nightmares regarding Elise's incarceration that constantly interrupt their ability to sleep.

360. Steve and Leslie suffer severe anxiety and panic attacks when receiving calls from unknown numbers because it reminds them of getting calls regarding Elise's incarceration.

361. Steve and Leslie have sought, or will seek once funds are available, counseling/medication regarding the severe mental and physical manifestations they suffer due to Elise's incarceration.

## EIGHTH CAUSE OF ACTION:

### Negligent Infliction of Emotional Distress
### (Brought by the Estate, Leslie, and Steve against the Hospital)

362. Plaintiffs incorporate by reference all preceding paragraphs as though set forth verbatim herein.

363. The Hospital owed Elise duties of reasonable care, as described herein.

364. The Hospital negligently breached those duties.

365. The Hospital should have realized that its conduct involved an unreasonable risk of causing Elise severe emotional distress and that such distress might result in illness or bodily harm.

366. The Hospital's breaches caused Elise severe emotional distress that resulted in mental and physical illness or bodily harm.

367. The Hospital's conduct caused damage to Elise.

368. The Hospital's relationship with Elise or activity or undertaking of providing (or withholding) medical care to (or from) her is of the type that warrants a special, limited duty to refrain from causing severe emotional distress to her parents.

369. The Hospital's relationship with Elise or activity or undertaking of providing (or withholding) medical care to (or from) necessarily implicate Leslie and Steve's emotional well-being, including because of Elise's dependency on them for her well-being.

370. There is an especially likely risk that the Hospital's negligence in the course of performing obligations pursuant to its relationship with Elise or undertaking of providing (or withholding) medical care to (or from) her will result in severe emotional distress to Leslie and Steve.

371. In fact, as alleged, the Hospital's negligence in the course of performing obligations pursuant to its relationship with Elise or undertaking of providing (or withholding) medical care to (or from) her did result in her suffering severe emotional distress.

372. The Hospital's negligence and Elise's severe emotional distress described in the immediately preceding paragraph caused Leslie and Steve to suffer severe emotional distress.

## NINTH CAUSE OF ACTION:

**Violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA")**
**(Brought by the Estate against the Hospital)**

373. Plaintiffs incorporate by reference all preceding paragraphs as though set forth verbatim herein.

374. The Hospital is subject to EMTALA because, on information and belief, the Hospital has entered into a provider agreement under 42 U.S.C.A. section 1395cc.

375. Under EMTALA, if a hospital knows an individual in its emergency department has an emergency medical condition, the hospital must provide either: (A) such further medical

examination and such treatment as may be required to stabilize the medical condition; or (B) transfer of the individual to another medical facility in accordance with certain rules. *See* 42 U.S.C.A. § 1395dd(b)(1).

376. Under EMTALA, if a hospital knows an individual in its emergency department has an unstabilized emergency medical condition, the hospital may not transfer the individual unless such transfer is an appropriate transfer to another medical facility and either: (A) the individual requests transfer to another medical facility in writing; or (B) a physician (or other qualified medical person) has signed a certification that the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual. *See* 42 U.S.C.A. § 1395dd(c)(1).

377. The Hospital violated EMTALA when it, as described herein, discharged and/or transferred Elise to the Jail without first stabilizing her ongoing emergency medical condition.

378. The Hospital further violated EMTALA when it discharged and/or transferred Elise to the Jail without a physician or other qualified medical person signing a certification that the medical benefits reasonably expected from the provision of appropriate medical treatment at the Jail outweighed the increased risks to Elise.

379. On information and belief, no medical provider working in the Hospital on December 18, 2024 prepared, or caused to be prepared, a certification of the type referenced in the immediately preceding paragraph.

380. On information and belief, neither Dr. Sorensen nor any medical provider working in the Hospital on February 20, 2025 prepared, or caused to be prepared, a certification of the type referenced in the immediately preceding paragraph.

381. The Hospital neither possesses, controls, nor has custody of any risk/benefit certification concerning Elise.

382. The Hospital has never possessed, controlled, or had custody of any risk/benefit certification concerning Elise.

383. As of her December 2024 discharge from the Hospital to the Jail, Elise was still a danger to herself and/or others.

384. As of her February 2025 discharge from the Hospital to the Jail, Elise was still a danger to herself and/or others.

385. Elise suffered personal harm, as described herein, as a direct result of the Hospital's violation of EMTALA.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all issues and claims so triable.

## PRAYER

WHEREFORE, plaintiffs pray the above-entitled Court for relief as follows:

1. For a money judgment for general or non-economic and special or economic damages against defendants in an amount to be proven at trial;
2. For an award of punitive damages because defendants' actions evidenced reckless or callous indifference to plaintiffs' rights;
3. For an award of attorney fees and costs incurred herein, including under 29 U.S.C. § 794a(b), 42 U.S.C. § 1988(b), 42 U.S.C. § 12205; and
4. For such other and further relief as the court deems just and equitable.

DATED: October 9, 2026.

KESLER & RUST

/s/ Ryan B. Hancey

______________________________

Ryan B. Hancey
Adam L. Grundvig
J. Adam Knorr
*Attorneys for plaintiffs*